## IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS

| | |
|---|---|
| DIGITAL ALLY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| DRAGONEYE TECHNOLOGY, LLC, | ) |
| a Georgia limited liability company | ) |
| Serve: Registered Agent | ) |
| Scott William Patterson | ) |
| 5680 Oakbrook Parkway, Ste. 149 | ) |
| Norcross, GA 30093, | ) |
| | ) |
| Defendant. | ) |

## **PETITION**

COMES NOW plaintiff Digital Ally, Inc. ("Digital") and for its claims for relief and causes of action against defendant DragonEye Technology, LLC ("DragonEye") alleges and states as follows:

### PARTIES AND JURISDICTION

1.      Digital is a corporation having its place of business in Johnson County, Kansas.

2.      DragonEye is a limited liability company organized and existing under the laws of the state of Georgia having Scott William Patterson of 5680 Oakbrook Parkway, Suite 149, Norcross, Georgia 30093 as its registered agent.

3.      As provided under K.S.A. 60-308(b) and whether in person or through its agents or instrumentalities, DragonEye has submitted to the jurisdiction of this court and to the service of process herein for the reasons that, *inter alia*:

      a.      It has transacted business in the state of Kansas within the meaning of § 60-308(b)(A);



EXHIBIT
A

4549015-1

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*

b.  It has committed tortious acts in this state within the meaning of § 60-308(b)(B);

c.  It has entered into express contracts with a resident of this state to be performed in whole or in part by either party in this state within the meaning of § 60-308(b)(E);

d.  It has caused injury to persons in this state as a result of acts or omissions by them occurring outside of this state when, at the time of such injury, products, materials, things processed, serviced or manufactured by them were used or consumed in this state in the ordinary course of trade or use;

e.  It has otherwise had contacts with this state sufficient to support jurisdiction over it consistent with the Constitutions of the United States and of this state; and

f.  The claims for relief and/or causes of action asserted herein each arise from and out of such acts, actions, conduct or omissions.

## ALLEGATIONS COMMON TO ALL COUNTS

4.  Digital is a public corporation, the securities of which are registered with the Securities & Exchange Commission ("SEC") and traded on one or more national exchanges.

5.  Digital is in the business of designing, manufacturing and/or selling electronic devices and equipment which products are sold throughout the United States and the world.

6.  The products designed, manufactured or sold by Digital consist, principally, of electronic video recording devices, the users and consumers of which are law enforcement agencies, public and private security organizations and various branches of the Armed Forces, whether of the United States or of other nations.

7.  Digital is a market leader in the design, manufacture and sale of such devices; it was among the first manufacturer to incorporate "digital technology" in its videographic products and it is the inventor and exclusive seller of the "mirror cam" wherein digital videographic devices are imbedded in the rearview mirror of motor vehicles used or employed by law enforcement agencies, security organizations and/or the Armed Forces.

8.    In addition, Digital is the seller, both in the United States and throughout the world, of hand-held devices capable of measuring the speed of moving objects by targeting the object with a laser and then analyzing the reflected light ("Lidar"), the principal users and consumers of which are law enforcement agencies, public and private security organizations and the Armed Forces.

9.    Digital sells its Products both to the end users thereof, often in response to "request for quotation", "request for bids" and/or "request for proposal" and to independent dealers, distributors, jobbers and/or sales agents who, together with the end users to whom Digital sells its Products directly, constitute and comprise Digital's customers.

10.    Pursuant to Certificate of Registration No. 3,762,290 issued to it by the United States Patent & Trademark Office ("USPTO") on March 23, 2010 and Certificate of Registration No. 3,766,107 issued to it by the USPTO on March 30, 2010, Digital is the owner and holder, absolutely and incontestably, of the registered trademark "DIGITAL ALLY®", both as it appears in standard characters and as the following fanciful and distinctive logo, logo type, badge, insignia, device and/or brand, together with all associated trade names, service marks, service names and trade dress:



11.    Pursuant to Certificate of Registration No. 3,949,322 issued to it by the USPTO on April 19, 2011, Digital is the owner and holder, absolutely and incontestably, of the

3

trademark **"LASER ALLY®"** together with all associated trade names, service marks, service names and trade dress, logos, logo types, badges, insignia, devices and brands.

12.     Each and all of the products designed, sold or manufactured by Digital are sold and marketed under the trademark **"DIGITAL ALLY®"** and under the logo, logo type, badge, insignia, device and/or brand:



13.     Further, Digital's hand-held Lidar devices are sold and marketed under the trademark **"LASER ALLY®"** in addition to Digital's **"DIGITAL ALLY®"** trademark, trade name, service mark, logo, logo type, badge, insignia, device and/or brand.

14.     On May 1, 2010, Digital and DragonEye made and entered into a written Supply Agreement, a copy of which is attached to this petition as **EXHIBIT 1** and by reference incorporated herein.

15.     In the context of the Supply Agreement, DragonEye agreed to each and all of the following:

        a.     During the term of the Agreement, Digital would have and enjoy "the exclusive right to sell and distribute" DragonEye's "proprietary law enforcement speed measurement device in a handheld form" ("Product") throughout the world;

        b.     DragonEye would manufacture such Product in "strict conformity with the Manufacturing Requirements" thereof and deliver them to Digital "in finished form" with all labels and packaging …";

        c.     Digital would have the right to purchase "1,000" such Products "during the period beginning with" DragonEye's "initiation of full-scale

manufacturing" and 1,000 "additional units per year for each year after" such initial 18 month period.

16.    In addition to the foregoing, DragonEye agreed that for purposes of the Supply Agreement and of the relationship contemplated therein, "Confidential Information" would mean "all information" in any form "provided by or on behalf of one party" to the Agreement that might be "disclosed to or observed by or on behalf of the other party" to the Agreement and which was:

a.    **"Disclosed in written or other tangible form and plainly marked as 'confidential', 'proprietary' or the like"**; or

b.    **"Disclosed in another manner with written notice of the confidential or proprietary nature of such information being provided by the Disclosing Party to the Recipient thereof within 15 days of the original disclosure to observance by the Recipient"**; or

c.    Which constituted information regarding **"the identity of, and terms under which"** Digital **"does business with its customers"**, *Id.*, § 13.2(b).

17.    In the context of the Supply Agreement, DragonEye agreed with respect to Digital's Confidential Information:

a.    That the disclosure thereof by Digital to DragonEye would **"not confer upon"** DragonEye **"any license, interest or rights of any kind in or to"** such information **"other than the right to use such"** information **"for the sole purpose of performing its obligations under the Agreement"**;

b.    That DragonEye **"would hold"** Digital's **"Confidential Information in strict confidence"**;

c.    That DragonEye would not **"use"** Digital's **"Confidential Information for any purpose other than to perform its obligations under [the] Agreement"**;

d.    That DragonEye would not disclose Digital's **"Confidential Information to any third party"**;

e.    That DragonEye would not **"copy, in whole or in part"** Digital's **"Confidential Information except as authorized in writing by"** Digital; and

5       *Clerk of the District Court, Johnson County Kansas*
4549015-1                                                    *06/05/13  04:41pm SS*

f. That whether with regard to **"the identity of, and terms under which"** Digital **"does business with its customers"** or otherwise, DragonEye would **"not use"** Digital's **"Confidential Information to circumvent or attempt to circumvent, avoid, by-pass or obviate any payment of compensation to which"** Digital **"would be entitled under any verbal or written agreement or other business arrangement with its customers"** (Supply Agreement, § 13).

18. Similarly, in the context of the Supply Agreement, DragonEye agreed that Digital's **"Intellectual Property Right[s]"** would mean:

a. **"Any right that is or may be granted or recognized under law concerning ... trademarks, service marks, brand names, certification marks, trade dress, domain names or any other indicia of origin"**;

b. **"The good will associated with the foregoing"**;

c. **"Any registrations or applications to register any of the foregoing ..."**;

d. **"Inventions and any discoveries whether patentable or not ..."**;

e. **"Trade secrets and rights in any jurisdiction to limit the use or disclosure thereof by any individual or entity ..."**;

f. **"Original works of authorship and any and all copyrights, whether registered or not ..."**;

g. **"Moral rights, database rights, design rights, industrial property rights, publicity rights and privacy rights and ..."**; and

h. **"Any similar intellectual property or property right"** (Supply Agreement, § 1.6).

19. In the context of the Supply Agreement, DragonEye agreed, with respect to Digital's **"Intellectual Property Right[s]"**, including all trademarks used in connection with the products to be sold by DragonEye to Digital; all **"marketing, promotional and sales material"** that Digital **"has created or will create in connection with the sales, marketing and promotion of the"** Product and **"all Intellectual Property Rights embodied therein and appurtenant thereto"**:

a. Would be and remain **"owned by and will remain the sole and exclusive property of"** Digital;

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*

4549015-1

    b.      That nothing "**contained**" in the Supply Agreement would "**be construed to give**" DragonEye "**any right, license, sublicense, title or interest in**" such Intellectual Property;

    c.      That DragonEye would have "**no right, license, sublicense, title or interest in any of**" such "**Intellectual Property except to the extent**" that Digital provided the same to DragonEye "**as … necessary for DragonEye to perform its obligations under [the] Agreement**" (Supply Agreement, § 10.2).

20.      On January 31, 2012, Digital and DragonEye made and entered into an "Amendment to Supply Agreement" ("Amendment"), a copy of which is attached to this petition as **EXHIBIT 2** and by reference incorporated herein.

21.      In the context of the Amendment, Digital and DragonEye agreed to the following:

    a.      The Supply Agreement would be modified to grant to Digital "the non-exclusive worldwide right to sell and distribute" the Lidar devices known as "Laser Ally Lidarcam Printer Combo and Dragoncam to law enforcement end users";

    b.      DragonEye would "have the right, from time to time, at its sole discretion, to sell" these same products "to other distributors or dealers or otherwise directly or indirectly [to] sell" them "to third parties"; and

    c.      Except "as specifically amended", the Supply Agreement would "remain in full force and effect in accordance with the terms thereof".

22.      During the period from and after the date of the Supply Agreement, Digital has paid a total of $2,978,958.07 to DragonEye in purchase of the "Lidar Product" specified therein and has otherwise performed each and all of its obligations to DragonEye, whether arising under the Supply Agreement or under the Amendment, as and when such performance was due.

23.      During the period from and after the date of the Supply Agreement and in reliance upon the terms thereof relating to the protection of its Confidential Information and its Intellectual Property, Digital has:

    a.      Expended substantial sums, time and effort, marketing and promoting its trademarks DIGITAL ALLY® and LASER ALLY® and enhancing the

commercial values, customer/consumer satisfaction and good will associated with those trademarks;

b.     Expended substantial sums, time and effort to develop and market technically advanced, competitively priced and commercially desirable Products to be sold and marketed under the trademarks DIGITAL ALLY® and/or LASER ALLY®;

c.     Expended substantial sums, time and effort to secure the approval by governmental authorities in various jurisdictions of Digital's LASER ALLY®-branded Product for thus approval for the purchase and use of such Product by law enforcement authorities in those jurisdictions including, *inter alia*, Provinces of the Commonwealth of Canada and states and other jurisdictions of the Commonwealth of Australia;

d.     Whether for purposes of protecting and securing such customers' warranty rights, or otherwise, provided DragonEye with complete and detailed lists and information showing each and all of the names of the persons and entities to whom it has sold its branded DIGITAL ALLY®/LASER ALLY® Product, including the names of each and all of its dealers, distributors, jobbers and sales agents;

e.     Provided DragonEye with the names of the persons, entities and organizations to whom it proposed or expected and had endeavored to sell its branded DIGITAL ALLY®/LASER ALLY® or other DragonEye-manufactured products;

f.     Identified those persons, entities and/or organizations who had transmitted "requests for quotation" and/or "request for proposal" to Digital signifying their interest in purchasing Digital-branded products.

24.     Notwithstanding the "Confidential Information" and/or "Intellectual Property"  provisions of the Supply Agreement and its agreement, whether in that context or otherwise, to abstain from any use or display thereof, DragonEye has created, established, operated and published an internet website wherein it uses and displays Digital's DIGITAL ALLY®, LASER ALLY® and



®

LOLOLLOLOLOLLOLOOLOOLOLOLOOLLOL

trademarks.

25.    A screen print of such website evidencing the use and display of such trademarks by DragonEye is attached to this petition as **EXHIBIT 3** and by reference incorporated herein.

26.    Through its acts and conduct, whether as described in the preceding paragraph or in the context of selling, marketing and/or promoting its own Lidar speed measurement devices in competition with Digital, generally:

     a.    DragonEye has used and displayed Digital's trademarks without permission, license or color of authority to do so:

          i.    When such lawful commercial purposes, if any, as DragonEye may have sought to accomplish through the use and display of Digital's trademarks could have been accomplished without any use of such trademarks;

          ii.    When the use in unmodified form of the entirety of Digital's trademarks was unnecessary; and

          iii.    When through the use and display of the entirety of Digital's trademarks, DragonEye falsely suggested that such intelligence, messages and/or meanings as DragonEye wished to communicate to the public by the medium thereof was approved, endorsed, sponsored or authorized by Digital when in truth and in fact it was not;

     b.    DragonEye has used Digital's trademarks in interstate commerce and the effect of such use has had a substantial or not insubstantial effect upon interstate commerce;

     c.    DragonEye's use of Digital's trademarks has created a substantial likelihood of confusion on the part of consumers as to the source, sponsorship, origin, kind and character of the goods, wares and merchandise otherwise identified on the website.

9

27.     Notwithstanding the provisions of the Supply Agreement relating to the preservation, protection, non-use and non-disclosure of Digital's "Confidential Information" and/or "Intellectual Property" and the fact that Digital is the owner and holder, absolutely and incontestably, of the trademarks DIGITAL ALLY® and LASER ALLY® together with each and all of the trade names, service marks, brand names, brands, devices, badges, insignia, logos, logo types and trade dress associated therewith ("Trade Dress"):

   a. DragonEye has imitated and copied Digital's Trade Dress, all of which is inherently distinctive, suggestive, arbitrary and/or fanciful and has acquired, in the minds of the consuming public, a secondary meaning, the effect of which is to identify and distinguish Digital, its products and services; and

   b. DragonEye has done so with the intent, in an attempt and with the effect of causing confusion, mistake or deception on the part of or with respect to the consumers of Digital's products and services.

28.     Notwithstanding the provisions of the Supply Agreement relating to the preservation, protection, non-use and/or non-disclosure of Digital's Confidential Information and/or Intellectual Property, it is Digital's informed belief that through the use of Confidential Information and/or Intellectual Property provided to it by Digital concerning and identifying Digital's dealers, distributors, jobbers and sales agents, DragonEye has sold its competing Lidar product as well as Digital's own LASER ALLY®-branded Product to such dealers, distributors, jobbers and/or sales agents including, *inter alia*, Digital's dealers, distributors, jobbers and sales agents in the Commonwealth of Canada and in the Commonwealth of Australia. 

29.     Notwithstanding the provisions of the Supply Agreement regarding the preservation, protection, non-use and/or non-disclosure of Digital's Confidential Information and/or Intellectual Property, it is Digital's informed belief that using information provided to it by Digital regarding the identity, needs and requirements of Digital's customers, DragonEye has sold competing Lidar products and/or Digital's own DIGITAL ALLY®-branded Product directly 

4549015-1

to procurement and authorities in Gwinnett County, Georgia and in Montgomery County, Maryland and elsewhere and thus existing customers of Digital.

30.     Notwithstanding the provisions of the Supply Agreement relating to the preservation, protection, non-use and non-disclosure of Digital's Confidential Information and/or Intellectual Property, it is Digital's informed belief that DragonEye has used information provided to it by Digital or provided by Digital to governmental procurement authorities with a bona fide expectation of secrecy and/or confidentiality, to respond on its own behalf, to Requests for Quotation and/or Requests for Proposal issued to Digital by procurement authorities in Gwinnett County, Georgia and/or Montgomery County, Maryland, among other jurisdictions; that it has thereby "undercut" the otherwise prevailing bid/price at which Digital proposed to sell its LASER ALLY®-branded Product to these procurement authorities, that it did so by essentially de minimis amounts and that it thereby sold its own competing Lidar devices to these procurement authorities in lieu of Digital's Products.

## COUNT I
### (Breach of Contract)

31.     Digital restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-30 hereinabove.

32.     Digital has fully performed each of its duties and obligations under the Supply Agreement and the Amendment.

33.     DragonEye has failed to keep and perform its own duties and obligations under the Supply Agreement and Amendment and is in breach of, *inter alia*, the "Confidential Information" and/or "Intellectual Property" provisions thereof.

34.     As a direct and proximate result of defendant's breach of the Supply Agreement and Amendment, Digital has suffered actual loss, injury and damage in an amount exceeding $100,000.

## COUNT II
### (Declaratory Judgment)

35.     Digital restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-34 hereinabove.

36.     An actual case and controversy exists between Digital and DragonEye concerning the latter's breach of the Supply Agreement and Amendment and/or Digital's corresponding right under the Supply Agreement and Amendment to terminate the same, and such case and controversy may be adjudicated by this Court.

37.     Digital has a reasonable apprehension of becoming a defendant in an action to enforce the Supply Agreement and Amendment and, accordingly, seeks a declaration that the same may and should be terminated according to their terms.

## COUNT III
### (Tortious Interference with Contract and with Business Expectancies)

38.     Digital restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-37 hereinabove.

39.     Digital had and has valid and enforceable contracts and reasonable expectancies of continued business relationships with its dealers, customers, distributors and/or trading partners.

40.     Those contracts and expectancies provide economic benefit to Digital.

41.     DragonEye knows and at all relevant times knew of the existence of Digital's contracts and business expectancies with its dealers, distributors, customers and/or trading

partners including the dealers, distributors, customers and/or trading partners with whom DragonEye has communicated and with whom it has entered into commercial transactions and relationships as alleged hereinabove.

42.    Digital's contracts and expectancies with its dealers, distributors, customers and/or trading partners would continue and would have continued undiminished and unaltered but for the conduct of DragonEye in interfering with such contracts, expectancies, customers, dealers, distributors and/or trading partners.

43.    DragonEye's interference with Digital's contracts and expectancies as described hereinabove was willful, intentional and without justification or excuse.

44.    As a direct and proximate result of DragonEye's actions, Digital has sustained damages exceeding $100,000.00.

**COUNT IV**
**(Trademark Infringement Under § 32 of the Lanham Act, 15 U.S.C. § 1114)**

45.    Digital restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-44 hereinabove.

46.    Digital is the owner and holder, absolutely and incontestably, of the registered trademarks **DIGITAL ALLY®**, **LASER ALLY®** and



trademarks.

47.     DragonEye has reproduced, counterfeited, copied and/or published colorable imitations of such registered trademarks.

48.     DragonEye has reproduced, counterfeited, copied and/or published colorable imitations of Digital's registered trademarks in a way that is likely to cause confusion in the marketplace concerning the source of products sold and distributed by Digital, on one hand, and Products sold and distributed by DragonEye, on the other.

49.     DragonEye's reproduction, counterfeiting, copying and/or publishing of colorable imitations of Digital's registered trademarks is wholly unauthorized by Digital.

50.     As a result of such counterfeiting, copying and/or publication of colorable imitations of Digital's trademarks, there is a substantial likelihood of confusion to consumers and in particular the likelihood that consumers will believe either that Digital is the source of DragonEye's products or services or that DragonEye is the source of Digital's products or services.

51.     As a direct and proximate result of DragonEye's unauthorized reproduction, counterfeiting, copying, colorable imitation and/or use of Digital's registered trademarks, Digital has suffered actual damages in an amount exceeding $100,000.00.

## COUNT V
### (Unfair Competition Under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))

52.     Digital restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-51 hereinabove.

53.     Digital's logos, logo types, brand names, badges, devices and insignia constitute Trade Dress designed and intended to be capable of distinguishing Digital's Products and services from the products and services of DragonEye and others.

14      *Clerk of the District Court, Johnson County Kansas*
*06/05/13   04:41pm SS*

54. Such Trade Dress is inherently distinctive for the reason that it is suggestive, arbitrary and/or fanciful and/or because it is descriptive and has, in the minds of the consuming public, acquired "secondary meaning", the effect of which is to identify and distinguish Digital's Products and services.

55. Digital's Trade Dress is capable of registration under § 2 of the Lanham Act, 15 U.S.C. § 1052 and, accordingly, is entitled to protection under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

56. § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) prohibits, in connection with any good or service, the unauthorized use of any trade dress by a competitor, that is likely to cause confusion or to cause mistake or to deceive the consuming public.

57. A substantial likelihood of confusion exists between Digital's Products and services and DragonEye's products and services for the reasons, *inter alia*, that:

     a. There is a substantial similarity between the Trade Dress used and adopted by DragonEye and Digital's prior and established Trade Dress;

     b. DragonEye intentionally copied the Trade Dress of Digital with the intent of causing confusion or mistake, or to deceive the consuming public as to the source or ownership of its own Products and services;

     c. DragonEye's adoption and use of such intentionally similar, confusing and deceptive Trade Dress has caused actual confusion in the minds of consumers as to the source or ownership of its Products and services;

     d. The Products and services offered by DragonEye are identical or substantially and deceptively similar to Digital's Products and services and such products and services are marketed in an identical manner to the same customers/consumers;

     e. In the face of such likelihood of confusion, mistake or deception, consumers are unlikely to exercise sufficient care to determine whether DragonEye's identical or substantially and deceptively similar Products and services are or are not the Products and services of Digital; and

     f. Digital's Trade Dress is inherently distinctive and closely associated in the minds of the consuming public with Digital's Products and services.

15

58.     Through the adoption of its identical or substantially and deceptively similar trade dress, DragonEye is guilty of unfair competition within the meaning of § 43 of the Lanham Act, 15 U.S.C. § 1125(a).

59.     As a direct and proximate result of such unfair competition, in violation of 15 U.S.C. § 1125(a), Digital has been damaged in an amount exceeding $100,000.

### COUNT VI
**(Violation of the Kansas Uniform Trade Secrets Act, Kan. Stat. Ann. § 60-3320, *et seq.*)**

60.     Digital restates and incorporates herein, *seriatim*, the allegations contained in ¶¶ 1-59 hereinabove.

61.     Digital's customer lists, lists of dealers and distributors, sales agents, sales figures, bids, proposals, quotations and other marketing, financial and business information are and represent information from which Digital derives competitive advantage and other independent economic value, whether actually or potentially, by virtue of the fact that such information is not generally known nor readily ascertainable through proper means by other persons who could themselves obtain economic value from the disclosure or use of such information.

62.     Such information is the subject of efforts by Digital which are reasonable, under the circumstances, to maintain the secrecy thereof including, without limitation, the following:

  a.  Restricting access to such information to members of Digital's management or third parties like DragonEye with whom it has entered into written agreements designed to preserve the secrecy and/or confidentiality thereof;

  b.  Requiring that all members of management execute and enter into a Confidentiality Agreement prohibiting the disclosure of such information; and

  c.  Requiring all members of management to execute and enter into an "Ethics Policy" agreement which likewise prohibits the disclosure of such information.

63.     In all respects, such information constitutes trade secrets within the meaning of

Kan. Stat. Ann. § 60-3320(4).

64.     DragonEye has misappropriated such trade secrets within the meaning of Kan.

Stat. Ann. § 60-3320(2) for the reasons that:

     a.    It has acquired such trade secrets from Digital and/or Digital's customers, dealers, distributors, sales agents and governmental procurement officers or agents having a duty to keep such information confidential with actual knowledge or with reason to know that it has thereby acquired such secrets by improper means;

     b.    It has used improper means to acquire knowledge of such trade secrets from Digital;

     c.    It has used improper means to acquire knowledge of such trade secrets and then used such trade secrets without the express or implied consent of Digital;

     d.    It has used these trade secrets without Digital's express or implied consent when, at the time such trade secrets were disclosed to it, DragonEye knew or had reason to know that its knowledge thereof:

          i.    Was derived from or through persons who had utilized improper means to acquire such trade secrets; or

          ii.    Was derived from or through persons who owed a duty to Digital to maintain the secrecy or limit the use of such trade secrets.

65.     As a direct and proximate result of the misappropriation of such trade secrets by

DragonEye, Digital has been damaged in its trade and business and in an amount exceeding

$100,000.00.

## COUNT VII
### (Conversion)

66.     Digital restates and incorporates herein, *seriatim*, the allegations contained in

¶¶ 1-65 hereinabove.

67.     DragonEye is in possession of, in tangible form, and has used and continues to

use Digital's trade secrets, Confidential Information and/or Intellectual Property.

68.     DragonEye did not have Digital's permission to retain, to use and/or continue to use Digital's trade secrets, Confidential Information and/or Intellectual Property in the manner alleged herein.

69.     DragonEye continues to exercise dominion and control over the tangible property represented by Digital's trade secrets, Confidential Information and/or Intellectual Property to the detriment and derogation of Digital's ownership interest therein and its right to possession thereof.

70.     As a direct and proximate result of such unlawful retention, dominion and control, Digital has been damaged in an amount exceeding $100,000.00.

### PRAYER FOR RELIEF

WHEREFORE, Digital Ally, Inc. requests the following relief:

A.     For temporary, preliminary and permanent injunctive relief restraining, enjoining and prohibiting DragonEye and all persons or entities acting in concert with or through it, or who/which may have notice of such relief:

     i.     From using or employing in any fashion Digital's trade secrets, Confidential Information and/or Intellectual Property as defined in the Supply Agreement identified hereinabove;

     ii.     From using, employing or displaying Digital's trademarks; and

     iii.     From using, employing or displaying Digital's logos, logo types, brand names, brands, badges, insignia and other Trade Dress.

B.     For temporary, preliminary and permanent injunctive relief restraining, enjoining and prohibiting DragonEye and all persons or entities acting in concert with or through it or who/which may have notice of such relief from disclosing, revealing, misappropriating, using or employing in any manner, by, through, with or in concert with any person or entity Digital's customer lists, supplier lists, lists of prospects and commercial contacts, bids, quotes, proposals,

18

4549015-1

responses to invitations to bid, to quote or for submission of a proposal, financial information, sales figures, training, management, sales, marketing and other materials and all other things, documents and information by whatever medium prepared, kept or recorded relating to Digital's business, products, dealers, distributors, sales agents, customers and/or clientele;

    C.    For judgment in favor of Digital and against DragonEye in an amount equal to the actual and consequential damages suffered and sustained by Digital as a result of their conduct;

    D.    For judgment in favor of Digital and against DragonEye for punitive damages in an amount sufficient to punish them for their conduct as aforesaid and to deter other and similar conduct by others;

    E.    For judgment in favor of Digital and against DragonEye in an amount equal to reasonable attorneys' fees, costs and expenses as suffered, expended or incurred herein; and

    F.    For such other and further relief as may be justified in the premises.

Respectfully submitted,

McDOWELL, RICE, SMITH & BUCHANAN

*/s/ Adam J. Gasper*
Adam J. Gasper, KS Bar #23967
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 telecopier
agasper@mcdowellrice.com

ATTORNEYS FOR PLAINTIFF

19

## SUPPLY AGREEMENT

This Supply Agreement (the "Agreement") is dated as of May 1, 2010 (the "Effective Date") and is between DragonEye Technology, LLC, a Georgia limited liability company, with offices located at 5860 Oakbrook Parkway, Ste. 149, Norcross, GA 30093 ("Supplier") and Digital Ally, Inc., a Nevada corporation with offices located at 7311 W. 130th Street, Ste. 170, Overland Park, KS 66213 ("Purchaser").

## RECITALS:

Supplier has developed a proprietary law enforcement speed measurement laser device in a handheld form. Purchaser is engaged in the manufacture, marketing and sale of digital video and audio recording systems as well as other products for use in the law enforcement, security, and public safety industry. Supplier desires to supply Purchaser with its proprietary laser device for marketing, distribution and sale by Purchaser, and Purchaser desires to purchase such device from Supplier for such purpose, in accordance with the terms and conditions of this Agreement.

## AGREEMENT:

Therefore, the parties agree as follows.

1.    Definitions. Capitalized terms used in this Agreement but not defined in the Section in which they are introduced will have the following meanings.

1.1.    "Affiliate" means, with respect to a party, any person controlling, controlled by or under common control with the party. "Control" for this purpose means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting equity, by contract, or otherwise.

1.2.    "Applicable Law" means, with respect to a party to this Agreement, any federal, state or local constitution, law, statute, ordinance, code, regulation or rule, enacted, adopted or promulgated by a Governmental Authority that is binding upon or applicable to the party, and any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any Governmental Authority or by any arbitrator that is binding upon or applicable to the party, unless expressly specified otherwise.

1.3.    "Confidential Information" means all information, whether in written, verbal, graphic, electronic, or any other form, provided by or on behalf of one party (the "Disclosing Party"), that is disclosed to or observed by or on behalf of the other party (the "Recipient"), such information being either (a) disclosed in written or other tangible form and plainly marked as "confidential," "proprietary," or the like, or (b) disclosed in another manner, with written notice of the confidential or proprietary nature of such information being provided by the Disclosing Party to the Recipient within 15 days of the original disclosure to or observance by the Recipient. Confidential Information does not include, and this Section does not apply to, any information that (z) is or becomes generally available to the public other than as a result of a disclosure by Recipient in breach of this Agreement, (y) was available to Recipient on a non-confidential basis prior

*Clerk of the District Court, Johnson County Kansas*
*...43  04:41pm S*

**EXHIBIT**

to its disclosure by Disclosing Party from a person who was not known by Recipient to be otherwise bound by a confidentiality agreement with Disclosing Party, or otherwise under an obligation to Disclosing Party not to transmit the information to Recipient, (x) is developed independently by the Recipient without use of or reference to the Disclosing Party's Confidential Information, or (w) the Disclosing Party agrees in writing is free of such restrictions.

1.4.    "Governmental Authority" means (a) foreign or federal, state, local, municipal or other government jurisdiction (including any political subdivision thereof), or (b) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers).

1.5.    "IACP" means the International Association of Chiefs of Police.

1.6.    "Intellectual Property Right" means any right that is or may be granted or recognized under Applicable Law concerning (a) trademarks, service marks, brand names, certification marks, trade dress, domain names and other indicia of origin, the goodwill associated with the foregoing, any registrations or applications to register any of the foregoing, and all renewals, extensions or reissues thereof; (b) inventions and discoveries, whether patentable or not, issued patents, applications for patents, and any renewals, extensions or reissues thereof;  (c) trade secrets and rights in any jurisdiction to limit the use or disclosure thereof by any individual or entity; (d) original works of authorship, and any and all copyright rights, whether registered or not; any registrations or applications for registration of copyrights, and any renewals or extensions thereof; (e) moral rights, database rights, design rights, industrial property rights, publicity rights and privacy rights; and (f) any similar intellectual property or proprietary rights.

1.7.    "Intellectual Property" means anything that is or may be protected by an Intellectual Property Right.

1.8.    "Manufacturing Requirements" means the Specifications, and the requirements of Applicable Law and  guidelines promulgated by the IACP as such requirements and guidelines may be modified from time to time.

1.9.    "Material Delay" means any delay in Purchaser's receipt of the Products within the designated lead times set out on the relevant purchase order.

1.10.    "Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Authority or other entity.

1.11.    "Product" means Supplier's proprietary law enforcement speed measurement laser device in a handheld form.

1.12.    "Specifications" means the technical and packaging and labeling specifications for the Product set forth on Schedule A, as may be modified by written agreement between the parties from time.

2.    Exclusive Distribution of the Product.  During the term of this Agreement, Supplier grants Purchaser the exclusive worldwide right to sell and distribute the Product to law enforcement end users.  If Supplier receives an inquiry from any potential law enforcement end user concerning the sale of Product, Supplier must transmit all such inquiries to the Purchaser.

2

*Clerk of the District Court, Johnson County Kansas*
*06/05/13   04:41pm SS*

The foregoing grant of rights to Purchaser does not include the right to sell the Product or modifications thereof to any users outside of law enforcement or in connection with laser camera systems for automated enforcement (picture of violator sent via mail or email).

3. **Manufacture, Supply and Distribution.**

　　3.1. **Manufacturing.**

　　　　(a)　　Supplier will manufacture the Products in strict conformity with the Manufacturing Requirements, and will deliver them to Purchaser in finished form with all labels and packaging as set out in the Manufacturing Requirements, ready for sale and delivery to customers in such quantities and at such times as required and ordered by Purchaser. The parties acknowledge and agree that Purchaser will resell the Products under the LASER ALLY trademark.

　　　　(b)　　Supplier will conduct the production, manufacture, testing, packaging, labeling and storage of Products and the handling, storage and disposal of any residues or wastes generated thereby in a safe and prudent manner, in compliance with all Applicable Laws and this Agreement. Supplier will obtain all necessary registrations, licenses and permits pertaining to activities contemplated by this Agreement.

4. **Forecasts, Purchase Orders, Shipment.**

　　4.1. **Forecasts.** At least fifteen (15) days prior to the start of each calendar quarter during the term of this Agreement, Purchaser will provide Supplier with a written estimate of the Product quantities that it will require during the quarter and for each of the three calendar quarters subsequent thereto. The parties agree that the Product estimates produced under this Section are for convenience purposes only, and that the Product estimates will not obligate Purchaser to purchase any specific amount of Products.

　　4.2. **Purchase Orders.**

　　　　(a)　　Upon execution of this Agreement, Purchaser will issue a binding purchase order to Supplier for ten (10) prototype Products.

　　　　(b)　　Subsequent to issuance of the initial purchase order for prototype Products, Purchaser will provide Supplier with binding purchase orders for the purchase of the Product from time to time, which will specify, at a minimum, the quantity ordered and requested delivery date (each a "Purchase Order"). Purchase Orders must be delivered to Supplier at least thirty (30) days prior to the shipment date requested in the Purchase Order. Supplier must confirm its acceptance or rejection of each Purchase Order submitted by Purchaser within five (5) days of receipt. Supplier may reject any Purchase Order that does not conform to the requirements of this Section or for quantities significantly in excess of amounts forecast by Purchaser pursuant to Section 4.1 of this Agreement.

　　4.3. **Minimum Purchase Requirement.**

　　　　(a)　　Purchaser hereby agrees to the following minimum purchase requirements (collectively the "Minimum Purchase

Requirement"): (i) one thousand (1,000) units during the period beginning with Supplier's initiation of full-scale manufacturing of the Product and ending on the date that is eighteen (18) months after such date; and (ii) one thousand (1,000) additional units per year for each year after the initial eighteen (18) month period described above.

(b)     Purchaser acknowledges and agrees that due to Supplier's requirements to develop and increase its production capacity, Supplier's may be limited during the initial year after the initiation of full-scale manufacturing of the Product to production as follows: first month – 50 units; second and third months – 100 units per month; fourth through sixth months – 150 units per month. Purchaser further acknowledges and agrees that such production limitations in the first six months after the initiation of full-scale manufacturing shall not release Purchaser from the Minimum Purchase Requirement.

4.4.   Conflicts. The terms and conditions of any purchase order, sales invoice, forecast, acknowledgement or similar document provided by Purchaser or Supplier for the purchase and sale of Product under this Agreement that are inconsistent with or in addition to the terms of this Agreement will be null and void unless otherwise agreed by the parties in a writing specifically referencing this Section.

4.5.   Delivery and Shipment. Supplier will arrange for all shipments of Product with a common carrier, at "ground" rates, reasonably acceptable to Purchaser to ensure timely shipment. Title and risk of loss will pass to Purchaser upon receipt of the shipment by Purchaser or its agent or representative or a common carrier designated by Purchaser.

5.    Payment, Pricing and Terms. Purchaser will pay Supplier for Product delivered to Purchaser at the price set forth on Schedule B or at an adjusted priced agreed upon by the parties as set forth in Schedule B. Terms are net 30 days from date of receipt.

6.    IACP Testing. During the term of this Agreement, Supplier will send a prototype or demonstration Product to the IACP for inspection, testing and approval listing. The Product must satisfy all current and future IACP requirements during the term of this Agreement. All costs and expenses of such inspection, testing and approval by the IACP will be borne by Supplier. If Supplier is unable to obtain IACP approval within 120 days, then Purchaser may terminate this Agreement.

7.    Inspection, Acceptance and Rejection of Product.

7.1.   Inspection of Shipments. Promptly upon receipt of each shipment, Purchaser or its designated agents will conduct an inspection of all Product supplied under this Agreement in a manner consistent with Purchaser's standard quality control procedures.

7.2.   Acceptance or Rejection of Products.

(a)     Purchaser may reject any non-conforming shipment of the Product or any portion thereof as defective. Purchaser will deliver written notice of any such rejection (a "Rejection Notice") to Supplier within 15 days after delivery of the Products to Purchaser.

Clerk of the District Court, Johnson County Kansas
06/05/13  04:41pm SS

   (b) Any failure to provide the Rejection Notice required by this Section to Supplier within the applicable period will be deemed acceptance by Purchaser of the shipment; however, no deemed or actual acceptance of Product by Purchaser or its designated agent will be deemed to waive, relieve Supplier of or release Supplier from, any of its warranties and associated obligations under this Agreement.

   (c) If all or any part of a shipment of Product is rejected by Purchaser, Purchaser's duty to pay for the rejected Product will be suspended unless and until there is a determination by the independent laboratory or consultant in support of Supplier's Objection Notice in accordance with this Section or the parties agree otherwise.

   (d) During the pendency of any rejection discussions, upon Purchaser's request, Supplier will promptly use commercially reasonable efforts to supply Purchaser with additional Product.

8. **Warranties.**

  8.1. Supplier warrants that the Products manufactured and sold by Supplier under this Agreement are at the time of delivery throughout the term of this Agreement:

   (a) materially free from defects in materials and workmanship,

   (b) manufactured, packaged and labeled in accordance with the Manufacturing Requirements,

   (c) comply with Applicable Law, and

   (d) strictly conform to the Specifications.

  8.2. Supplier warrants that all Products sold and delivered to Purchaser under this Agreement will be free and clear of all liens, claims and encumbrances.

  8.3. Supplier warrants that it is materially abiding by all Applicable Laws in the operation of its business, and prior to the date of this Agreement has acquired all requisite licenses and permits, and such licenses and permits will remain in force and effect throughout the term of this Agreement.

  8.4. Supplier warrants that it has no knowledge, as of the Effective Date, of a claim or allegation against Supplier alleging that any Intellectual Property or technology proprietary to Supplier relating to the Products or that will be used by Supplier to manufacture the Products under this Agreement infringes the Intellectual Property Rights of a third party.

  8.5. Purchaser agrees that it will not give or make any warranties or representations to any customer, end-user or other third party as to quality, merchantability, fitness for a particular use or purpose or any other features of the Product other than those contained in the warranty applicable to the Product given by Supplier to the original end-user, a summary description of which is included in Schedule A attached hereto. To assist Supplier in its management of possible warranty claims, Purchaser agrees to provide monthly written sales reports to Supplier during the term of this Agreement, such reports to include the unit serial numbers, name of end user

CC 2256130v1    *Clerk of the District Court, Johnson County Kansas*
               *06/05/13  04:41pm SS*

customer, and dates of sale and shipment for Products sold in the report month. The parties further agree that such reports shall be considered Confidential Information as defined herein.

8.6.     Purchaser warrants that it is materially abiding by all Applicable Laws in the operation of its business, and prior to the date of this Agreement has acquired all requisite licenses and permits, and such licenses and permits will remain in force and effect throughout the term of this Agreement

9.     Term and Termination.

9.1.     Term.  The term of this Agreement begins on the Effective Date and expires on the date that is three (3) years and six (6) months after the date of Supplier's initiation of full-scale manufacturing of the Product (the "Initial Term"), unless terminated earlier under the provisions of this Agreement or unless extended by written agreement of the parties.  Initiation of full-scale manufacturing of the Product shall be deemed to occur on the date of shipment of Product hereunder other than the shipment of ten prototype units specified in Section 4.2(a). In the event that the parties continue to do business with each other after expiration of the Initial Term without execution by the parties of a written agreement relating to extension of this Agreement, this Agreement shall be deemed to be renewed on a month-to-month basis, and shall be terminable by either party on thirty (30) days notice with or without cause.

9.2.     Termination of the Agreement or a Purchase Order.

(a)     Either party may terminate this Agreement or one or more Purchase Orders by the delivery of written notice to the other party if the other party materially breaches this Agreement or a Purchase Order and does not cure the breach to the reasonable satisfaction of the non-breaching party within 30 days after delivery of the written breach notice. Unless otherwise specified in the breach notice, or unless the breach has been cured, the termination is effective 31 days after the date of Purchaser's breach notice.  For any breach incapable of cure during the notice period, the non-breaching party may terminate this Agreement or one or more Purchase Orders immediately.

(b)     For purposes of this Agreement:  (i) Material Delays by Supplier, failure to satisfy relevant IACP testing or maintain IACP approved listings, or high failure rates reported to Purchaser by its end users will be treated as a material breach of this Agreement; and (ii) if a party becomes insolvent (as such term is defined in the Uniform Commercial Code), is generally not paying its debts as the same become due (unless such debts are in bona fide dispute), commences or has commenced against it any insolvency proceeding (as such term is defined in the Uniform Commercial Code) including any assignment for the benefit of creditors, invokes the provisions of any law for the relief of debtors (including any bankruptcy or reorganization law), transfers a substantial part of its property or assets other than in the ordinary course of business, or ceases ordinary business operations, such party shall be deemed to be in material breach of this Agreement.

6

CC 2256130v1

Clerk of the District Court, Johnson County Kansas
06/05/13   04:41pm SS

9.3.   Effect of Termination.

(a)     Any termination of this Agreement will not affect or in any way diminish any party's right under law or in equity in respect of a breach including, without limitation, the right to damages or injunctive relief.

(b)     In the event that this Agreement is terminated for any reason other than breach by Purchaser, and except as otherwise agreed by the parties in writing, Supplier will honor any then existing Purchase Orders, which will be shipped and paid by Purchaser in accordance with the terms of this Agreement. Within fifteen (15) days of the date this Agreement is terminated, Purchaser will purchase from Supplier any inventory of finished Products in the possession of Supplier; however, Purchaser has no obligation to purchase any quantity of finished Products that exceeds Purchaser's forecasts provided to Supplier under Section 4.1.

(c)     Sections 1, 7, 8, 9.3, 10, 11, 12, 13, 14, 15 and any other provisions necessary and proper to give effect to the intention of the parties as to the effect of the Agreement after termination will survive any expiration or termination of this Agreement. In addition, unless otherwise expressly set forth herein, no expiration or termination of this Agreement will have any affect on any payment, obligation, representation or warranty under this Agreement accruing or arising prior to or subsequent to such expiration or termination, or any other agreement between the parties.

10.   Intellectual Property.

10.1.   Supplier Ownership. As between Supplier and Purchaser, Purchaser acknowledges and agrees that the Products, and all manufacturing methods, processes, procedures, techniques and know-how related to the Products, the specifications and other requirements for Products, and the trade dress for the Products (but not including any trademarks owned by Purchaser), and all Intellectual Property Rights embodied therein and appurtenant thereto, whether developed prior to the Effective Date or in connection with this Agreement by Supplier (collectively, the "Supplier Intellectual Property"), are owned exclusively by Supplier and will remain the sole and exclusive property of Supplier. Except as necessary to advertise, promote, distribute and sell Products under this Agreement, Purchaser does not receive any right, license, sublicense, title or interest in, and Purchaser acknowledges that it has no right, license, sublicense, title or interest, in any of the Supplier Intellectual Property. Except as necessary to advertise, promote, distribute and sell Products under this Agreement, Purchaser will not, directly or indirectly, use or enable others to use any Supplier Intellectual Property, whether for its own account or the account of others.

10.2.   Purchaser Ownership. As between Purchaser and Supplier, Supplier acknowledges and agrees that all trademarks used in connection with Products and provided by Purchaser, and all marketing, promotional and sales materials Purchaser has created or will create in connection with the sales, marketing and promotion of the Products, including all Intellectual Property Rights embodied therein and appurtenant

7

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*

thereto, whether developed prior to the Effective Date or in connection with this Agreement by Purchaser (the "Purchaser Intellectual Property"), are owned by and will remain the sole and exclusive property of Purchaser. Nothing contained herein will be construed to give Supplier any right, license, sublicense, title or interest in, and Supplier acknowledges that it has no right, license, sublicense, title or interest, in any of the Purchaser Intellectual Property, except to the extent Purchaser provides Supplier with Purchaser Intellectual Property as may be necessary for Supplier to perform its obligations under this Agreement.

11.   Indemnification.

11.1.   By Supplier.  Subject to the provisions of this Agreement, Supplier will defend Purchaser, its Affiliates and their respective officers, employees and agents from any claims, demands, actions, suits, prosecutions and other proceedings brought by or on behalf of a third party (each a "Claim"), and will pay all resulting damages, liabilities, losses, fines, penalties, judgments, awards, settlements, costs and expenses (including reasonable attorneys' fees and costs) (collectively, "Losses") incurred by any of them due to a Claim that arises from or is related to any actual or alleged: (a) breach by Supplier of this Agreement; (b) failure by Supplier to manufacture and supply the Products in accordance with the Manufacturing Requirements or this Agreement; (c) injury or harmful effect caused by the Products, provided that the Products have not been altered or modified in any manner by Purchaser; or (d) infringement or misappropriation of any third party's Intellectual Property Rights by the Supplier Intellectual Property. Notwithstanding the foregoing, Supplier will have no obligations under this Section to the extent any Claim arises or results from any claim for which Purchaser is required to indemnify Supplier under Section 11.2, or the gross negligence, intentional misconduct, or material breach of this Agreement by Purchaser, its employees or independent contractors.

11.2.   By Purchaser.  Subject to the provisions of this Agreement, Purchaser will defend Supplier and its officers, employees and agents from any Claim and will pay all Losses incurred by any of them due to a Claim that arises from or is related to: (a) any actual or alleged breach by Purchaser of this Agreement; (b) any actual or alleged infringement or misappropriation of any third party's Intellectual Property Rights by the Purchaser Intellectual Property; or (c) the manufacturing, distribution or sale of any products by Purchaser other than the Products. Notwithstanding the foregoing, Purchaser will have no obligations under this Section to the extent any Claim arises or results from any claim for which Supplier is required to indemnify Purchaser under Section 11.1, or the gross negligence, intentional misconduct, or material breach of this Agreement by Supplier, its employees or independent contractors.

11.3.   Procedure.  Each party will promptly notify the other party of any notice of the commencement or filing of any Claim for which the other party is entitled to indemnification under this Agreement and the indemnified party will provide reasonable assistance, at the indemnifying party's request and sole expense, needed in the defense or settlement of any Claim. Failure to give or delay in giving such notice or assistance will relieve either party of its indemnification obligations under this Agreement. The indemnifying party will have sole control of the defense and settlement of any Claim; however, no compromise or settlement may be committed to without the indemnified

**8**

*Clerk of the District Court, Johnson County Kansas*
*06/05/13   04:41pm SS*

party's prior written consent unless: (a) it includes a full discharge and release of liability for the indemnified party, (b) it has no effect on any rights or obligations of the indemnified party, or on any Claims that may be made by or against the indemnified party, and (c) there is no injunctive or other equitable relief entered against the indemnified party. The indemnified party also may elect to participate in the defense of any Claim at its own expense with counsel of its choice.

12.     Insurance, Limitations of Liability.

12.1.     By Supplier.  Supplier will obtain and maintain at all times, during the Term, comprehensive general liability coverage appropriate to its activities with reputable and financially secure insurance carriers to cover its activities related to this Agreement.  Additionally such insurance coverage will include, without limitation, product liability coverage of an appropriate amount, not less than $1 million per occurrence, for so long as the Products are being sold under this Agreement.  The Purchaser will be named as an "additional insured" under such policy with respect to matters for which Supplier is responsible; however, such coverage of Purchaser as an additional insured under such policy will be primary with respect to product liability matters consistent with Supplier's indemnification obligations, to the extent such obligations are insurable.  Supplier will provide Purchaser with a certificate of insurance evidencing such coverage upon request of Purchaser.

12.2.     By Purchaser.  Purchaser will obtain and maintain at all times during the Term, comprehensive general liability coverage appropriate to its activities with reputable and financially secure insurance carriers to cover its activities related to this Agreement.  Additionally such insurance coverage will include, without limitation, product liability coverage of an appropriate amount, not less than $1 million per occurrence, for so long as the Products are being sold under this Agreement.  Purchaser will provide Supplier with a certificate of insurance evidencing such coverage upon the request of Supplier.

13.     Confidentiality.

13.1.     Ownership.  The Disclosing Party's disclosure of Confidential Information to the Recipient under this Section does not confer upon the Recipient any license, interest or rights of any kind in or to the Disclosing Party's Confidential Information, other than the right to use such Confidential Information for the sole purpose of performing its obligations under the Agreement.

13.2.     Restrictions on Use and Disclosure.

(a)     The Recipient will hold the Disclosing Party's Confidential Information in strict confidence.  The Recipient will not: (i) use the Disclosing Party's Confidential Information for any purpose other than to perform its obligations under this Agreement; (ii) disclose the Disclosing Party's Confidential Information to any third party (other than to the Recipient's employees who have a need to know the information in order to perform the Recipient's obligations under this Agreement); or (iii) copy, in whole or in part, the Disclosing Party's Confidential Information except as authorized in writing by the Disclosing Party.

9

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*

(b)     Without limiting anything stated in this Section or elsewhere in the Agreement and for avoidance of doubt, Supplier acknowledges that the identity of, and terms under which Purchaser does business with its customers is Purchaser's Confidential Information. Supplier represents and warrants that it will not use Purchaser's Confidential Information to circumvent or attempt to circumvent, avoid, by-pass or obviate, any payment of compensation to which Purchaser would be entitled under any verbal or written agreement or other business arrangement with its customers.

13.3.    Recipient's Responsibility.  The Recipient will be responsible for any unauthorized disclosure or use of the Disclosing Party's Confidential Information by any of its employees, and will indemnify the Disclosing Party for any damages arising out of such unauthorized disclosure or use.

13.4.    Injunctive Relief.  The Recipient acknowledges that its breach or threatened breach of the obligations set forth in this Section would cause the Disclosing Party irreparable injury for which the Disclosing Party would not have an adequate remedy at law.  In the event of the Recipient's breach or threatened breach, the Disclosing Party will be entitled to seek injunctive relief without posting a bond, in addition to any other remedies the Disclosing Party may have at law or in equity.

13.5.    Return of Confidential Information.  Upon any expiration or earlier termination of this Agreement, the Recipient will return to the Disclosing Party, at the Recipient's expense, all of the Disclosing Party's Confidential Information and any other documents, equipment, computer files, software and any other item, in any medium, received from the Disclosing Party and will provide the Disclosing Party with written certification of its compliance with this provision upon request by the Disclosing Party.

14.    End User Service Obligations.  As part of its obligations hereunder, Purchaser shall provide initial customer service and technical support to end users of the Product, such service and support to be provided by telephone or email as appropriate.  In the event the initial customer service and technical support by Purchaser is unable to resolve end user issuers, Purchaser will request a Return Material Authorization ("RMA") from Supplier, and upon RMA issuance by Supplier, Purchaser will provide instructions to end users for direct shipment of Products to Supplier for diagnosis and repair as applicable by Supplier.  In no event will Supplier have any obligations hereunder to provide training, customer service or technical support to end users of the Product.

15.    General.

15.1.    Time of Essence.  Time is of the essence of this Agreement and of every part hereof.

15.2.    Bankruptcy.  Any party's failure to assert its right to retain its benefits under this Agreement in accordance with 11 U.S.C. §365(n)(1)(B) (as may be amended from time to time) will not be construed as a termination of this Agreement by such party under 11 U.S.C. §365(n)(1)(A) (as may be amended from time to time).

15.3.    Independent Party Status.  Purchaser and Supplier are independent parties under this Agreement, and nothing in this Agreement will be construed to create any

10

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*

partnership, joint venture, or agency relationship between the parties. Neither party is granted any authority under this Agreement to enter into agreements of any kind on behalf of the other party, or to bind or obligate the other party in any manner to any third party.

15.4.   No Assignment. Neither party may assign its rights or delegate its duties under this Agreement without the prior written consent of the other party. This Agreement is binding upon, and will inure to the benefit of each party and its respective successors and permitted assigns.

15.5.   Notices. All notice and other communications relating to this Agreement must be sent by nationally recognized overnight courier, and properly addressed to the parties at the their respective addresses set out in the preamble, or to such other address as any party may request by notice given to the other party in accordance with this Section. Notices will be deemed effective upon receipt.

15.6.   Governing Law; Jurisdiction. This Agreement will be governed by and any dispute arising under this Agreement will be determined in accordance with the laws of the State of Kansas, without giving effect to conflict of laws principles.

15.7.   No Waiver. A party, by mere lapse of time, without giving notice or taking other action under this Agreement, will not be deemed to have waived any breach by the other party of any of the provisions of this Agreement. Further, the waiver by a party of a particular breach of this Agreement by the other will neither be construed as nor constitute a continuing waiver of such breach or of other breaches of the same or any other provision of this Agreement.

15.8.   Force Majeure. No party will be responsible or liable for or deemed in breach because of any delay in or failure of the performance of its respective obligations under this Agreement to the extent that such delay is due to circumstances beyond the reasonable control, and without the fault or negligence, of such party claiming the protection of this Section. However, the party claiming the protection of this Section must promptly provide the other party with written notice of such force majeure upon becoming aware of such force majeure; and must exercise reasonable diligence in an effort to minimize and eliminate the impact of such force majeure.

15.9.   Entire Agreement; Amendment. This Agreement (including the schedules) is the complete and exclusive statement of the agreement between the parties with respect to the subject matter and supersedes all proposals, understandings, representations, conditions, warranties, covenants, and all other communications between the parties (whether verbal or written) relating to the subject matter, including but not limited to the Mutual Non-Disclosure Agreement entered into by and between the parties as of March 24, 2010. This Agreement may be amended or waived only by a writing that specifically refers to this Agreement and that is signed by both parties. No other act, document, usage, or custom will be deemed to amend or waive any provision of this Agreement.

15.10.   Severability. If a court of competent jurisdiction finds any provision of this Agreement to be invalid, illegal or unenforceable, the parties will negotiate in good faith to modify this Agreement in a mutually acceptable manner to permit the

11

transactions contemplated by this Agreement to be consummated as originally contemplated to the fullest extent possible, and all other terms and provisions of this Agreement will nevertheless remain in full force and effect.

15.11. Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered will be deemed to be an original but all of which when taken together will constitute one and the same agreement.

15.12. Prevailing Party's Expenses of Dispute Resolution. In the event of litigation or arbitration between the parties related to this Agreement, the non-prevailing party will reimburse the prevailing party for any costs and expenses (including, without limitation, attorneys' fees) reasonably incurred by the prevailing party in connection therewith.

The parties caused this Supply Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

DragonEye Technology LLC

By: _____

Scott Patterson, President & CEO

Digital Ally, Inc.

By: _____

Name: Ken McCoy          Thomas J. Heckman

Title: Vice President F          CFO

CC 2256130v1

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*

## SCHEDULE A

## SPECIFICATIONS

1. Product Format and Dimensions:

 

2. Labeling:
   a. Purchaser supplied label dimensions for Product: 69.0 mm x 14.75 mm two places shown below.
   b. Purchaser may supply labels for carrying case and boxes if desired.
   c. Supplier label on underside of unit as shown below to include Supplier name, Product serial number and FDA laser certification.

Purchaser label position ─



Purchaser label position ─

13

*Clerk of the District Court, Johnson County Kansas*
*06/05/13   04:41pm SS*



Supplier label position

3.  Packaging
    a.  Hard shell plastic carrying case with custom foam insert.
    b.  Operator's Manual
    c.  Two alkaline C-cell batteries.
    d.  Heavy duty cardboard box shipping container.

4.  Performance Specifications:

Weight:            </= 2.5 lb (1.14 kg) with batteries
Dimensions:        4.5 x 6.75 x 9.75 inches
                   (11.4 x 17.1 x 24.8 cm)

Acquisition Time:  1/3 Second
Speed Accuracy:    +/- 1 MPH (+/- 2 KPH)
Minimum Range:     Speed Mode      50 ft (15 m)
                   Range Mode      10 ft (3 m)
                   Weather Mode    250 ft (76 m)

14

Clerk of the District Court, Johnson County Kansas
06/05/13   04:41pm SS

| | |
|---|---|
| Speed Max/Min: | +/- 5 to 200 MPH (+/- 8 to 320 KPH) |
| Speed Mode: | True, Full time, Continuous Tracking History |
| Distance Accuracy: | +/- 0.5 ft (+/- 15.0 cm) one sigma |
| Distance Resolution: | 0.1 ft (3.0 cm) |
| Beam Divergence: | 2.5 milliradian |
| Laser Source: | Diode, 905 +/- 10 mm |
| Eye Safety: | FDA CDRH Class 1 |
| Temperature Range: | -22° F to +140° F (-30° C to +60°C) |
| Power Source: | Two C-cells; High Quality Alkaline or NiMH Rechargeable |
| Battery Life: | Up to 25 Hours of Operation (Alkaline C- cell) |
| Environmental: | Waterproof to IP67 |
| Additional Features: | Timed Distance (Stopwatch) Mode |
| | Obstruction Mode |
| | Advanced Anti-Jamming ECCM |

5.  Summary of Principal Terms of Warranty to End Users:

Twelve (12) months from date of sale to end user, non-transferable, and subject to exclusions and limitations as specified in warranty statement accompanying Product.

15

**SCHEDULE B**

**PRICING**

ONE THOUSAND SEVEN HUNDRED SIXTY-THREE Dollars and 00/100 ($1,763.00) per Product unit.

The above pricing is for the base unit of the Product as produced by Supplier. Any modifications to the base unit, including but not limited to changes based on special requirements of end users or based on country-specific requirements outside the USA, will result in software, nonrecurring engineering and other costs, and accordingly will result in price increases above the base price stated above. Such increases shall be discussed between the parties, and shall be deemed to be agreed upon: (i) written agreement between the parties; or (ii) issuance of a purchase order by Purchaser indicating such adjusted price and acceptance of the purchase order by Supplier

16

## AMENDMENT TO SUPPLY AGREEMENT

This Amendment to Supply Agreement (the "Amendment") is dated as of January 3̲1̲, 2012 (the "Amendment Effective Date") and is between DragonEye Technology, LLC, a Georgia limited liability company, with offices located at 5860 Oakbrook Parkway, Ste. 149, Norcross, GA 30093 ("Supplier") and Digital Ally, Inc., a Nevada corporation with offices located at 7311 W. 130ᵗʰ Street, Ste. 170, Overland Park, KS 66213 ("Purchaser").

### RECITALS:

Supplier and Purchaser entered into a Supply Agreement as of May 1, 2010 (the "Agreement") and now wish to amend certain terms and conditions thereof.

### AGREEMENT:

Therefore, the parties agree as follows:

1.    Definitions.

a)    Section 1.11 of the Agreement is hereby amended and restated in its entirety to provide as follows:

1.11    "Products" means:

(a)    Supplier's proprietary handheld law enforcement speed measurement device as specified in Schedule A hereto and marketed by Purchaser under the name Laser Ally ("Laser Ally");

(b)    Laser Ally with integrated consumer digital camera ("Laser Ally LIDARcam");

(c)    Laser Ally modified with portable thermal printer to provide real-time printing ("Printer Combo");

(d)    Laser Ally modified and combined with custom high-magnification camera system with daylight-viewable rugged tablet computer and designed for automated enforcement ("DragonCam"); and

(e)    The miniaturized law enforcement speed measurement device that as of the Amendment Effective Date is designated by Supplier as the DragonEye Compact Speed Lidar ("Compact Lidar").

b) Section 1.14 of the Agreement is hereby amended and restated in its entirety to provide as follows:

1.12    "Specifications" for Laser Ally means the technical, packaging and labeling specifications set forth on Schedule A, as may be modified by written



**EXHIBIT**

**2**

*Clerk of the District Court, Johnson County, Kansas*
*06/05/13   04:11pm SS*

agreement between the parties from time to time; and for Laser Ally LIDARcam, Printer Combo, DragonCam, and Compact Lidar means the technical, packaging and labeling specifications set forth in writing by Supplier in its sole discretion.

2.    Distribution of the Product.  Section 2 of the Agreement is hereby amended and restated in its entirety to provide as follows:

2.    Nonexclusive Distribution. During the term of this Agreement, Supplier grants Purchaser the nonexclusive worldwide right to sell and distribute Laser Ally, Laser Ally LIDARcam, Printer Combo, and DragonCam to law enforcement end users. By way of illustration and not of limitation, Supplier shall have the right, from time to time, at its sole discretion, to sell the Product to other distributors or dealers or otherwise directly or indirectly sell the Product to third parties. The foregoing grant of rights to Purchaser does not include the right to sell the Product or modifications thereof to any users outside of law enforcement. In addition, subject to the foregoing limitations, Supplier agrees to grant Purchaser the nonexclusive worldwide right to sell and distribute the Compact Lidar to law enforcement users if and when Supplier makes such product generally available to distributors.

3.    Minimum Purchase Requirements.  Section 4.3 of the Agreement is hereby amended and restated in its entirety to provide as follows:

(a)    Purchaser hereby agrees to the following minimum purchase requirements for units of the Laser Ally (collectively the "Minimum Purchase Requirements"): (i) one thousand (1,000) units during the period beginning with Supplier's initiation of full-scale manufacturing of the Laser Ally and ending on February 29, 2012; and (ii) forty (40) units per calendar month during the twenty-four (24) month period beginning March 1, 2012 and ending February 28, 2014.

(b)    In the event Purchaser purchases more than forty (40) units of Laser Ally during any calendar month beginning on March 1, 2012, the excess of such purchase over the monthly minimum purchase of forty (40) shall reduce the Minimum Purchase Requirement for the following month or months as applicable. By way of illustration and not of limitation, in the event that Purchaser purchases one hundred and twenty (120) units of Laser Ally during a calendar month, the Minimum Purchase Requirement for each of the following two (2) months shall be zero.

(c)    In the event that Purchaser purchases LIDARcam, Printer Combo, and/or DragonCam, the parties agree that such purchases shall apply to the Minimum Purchase Requirements stated herein.

2

4.    Purchase Price. Section 5 of the Agreement is hereby amended and restated in its entirety as follows:

    5.    Payment, Pricing and Terms.

        5.1    Purchaser will pay Supplier for Laser Ally units delivered to Purchaser at the price set forth on Schedule B or at an adjusted price agreed upon by the parties as set forth in schedule B. Supplier hereby agrees that in the event that it sells or otherwise distributes Laser Ally units to third parties at prices more favorable than the pricing stated in Schedule B, that it will notify Purchaser of such revised pricing and make Laser Ally units available to Purchaser at equivalent pricing.

        5.2    Purchaser will pay Supplier for Compact Lidar units at the price established by Supplier in its sole discretion; provided, however, that Supplier will offer to Purchaser a pricing program, including but not limited to discounted pricing based on quantities ordered, no less favorable than the program or programs offered to other distributors or dealers.

        5.3    Terms are net 30 days from receipt of invoice.

    5.    Effect of Amendment. Except as specifically amended herein, the Agreement shall remain in full force and effect in accordance with the terms thereof.

    IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective duly authorized representatives as of the Amendment Effective Date.

DragonEye Technology, LLC

By: _____
    Scott Patterson, President & CEO

Digital Ally, Inc.

By: _____
Name: _Stanton E Koss_  _Thomas J. Heckman_
Title: _CEO_  _CFO_

3


# DragonEye Technology

*Advanced Electro-Optical Sensor Systems*

HOME     PRODUCTS     ACCESSORIES     PURCHASE     SUPPORT     ABOUT US     CONTACT

# Products





Fast, Accurate, Rugged, Balanced, with sophisticated anti-jamming... simply the most advanced law enforcement speed LIDAR available

LEARN MORE





Lightweight, economical and compact laser speed enforcement

LEARN MORE





The DragonEye Lidar with integrated imaging and video capabilities

LEARN MORE





Automated Speed Enforcement Lidar System and Services

LEARN MORE



Advanced Speed Lidar system distributed exclusively by Digital Ally, Inc., designed and built by DragonEye Technology

LEARN MORE

## Product Accessories

Click here for information on accessories including rechargeable batteries/chargers, cases, shoulder straps and more

DragonEye Home | Products | Accessories | Purchase | Support | About Us | Contact

EXHIBIT
3

*Clerk of the District Court, Johnson County Kansas*
06/05/13  04:41pm S



| HOME PAGE | PRODUCTS | COMPANY | INVESTOR RELATIONS | RESOURCES | CONTACT US | CUSTOMER SUPPORT |

*LASER SPEED DETECTOR*          **POLICE LIDAR SPEED GUNS**

# LASER ALLY™ LIDAR SPEED GUNS



**FREE GRANT ASSISTANCE FOR THIS PRODUCT**

Request free help getting LIDAR speed enforcement grants. Grant writing discounts also available.



**Laser Ally™ LIDAR Speed Guns** are a new breakthrough in hand-held LIDAR speed detectors. Designed in conjunction with one of the leading experts in LIDAR, they provide...

**Extreme Accuracy**
Pinpoint the speed and direction of a vehicle in single or multi-lane traffic. Unlike with traditional RADAR, laser speed detectors utilize an extremely narrow beam, allowing speed detection and targeting to be unaffected by traffic congestion.

**Cutting Edge Anti-Jamming Technology**
Laser Ally Speed Guns were the only LIDAR systems not detected or jammed in a recent third-party test against the leading LIDAR systems and LIDAR jammers.

**Total Reliability**
Laser Ally Speed Guns are ruggedized for heavy use and waterproof for harsh environmental conditions, amazingly fast and accurate with anti-jamming technology, and provide complete courtroom credibility. The gun's body is composed of a polycarbonate ABS blend for strength and chemical resistance. Critical alignment components are tied together by a second internal die cast metal structure to withstand a drop without

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*

Laser Ally Police LIDAR Speed Guns



requiring realignment.

**Laser Ally LIDAR Speed Guns Feature:**

- Small, Light & Balanced (Compact Model Also Available)
- Incredible, Extended Range
- Extremely Fast Acquisition Time
- Advanced Anti-Jamming
- Tree, Fence, etc. Obstruction Mode
- Superior Weather Mode
- True Continuous Tracking with Audio
- Internal Electronic Tests, Software Verification & Digitally Locked High Speed Timing
- True Color 1:1 Head-Up Display for Accurate Vehicle Colors & No Eye Strain
- *NEW* Models Available for Still Image & Video Recording
- *NEW* Optional Folding 8x Monocular HUD Scope for Extended Range Identification
- Easy To Use Menu
- Improved Alignment Stability
- Integrates with Digital Ally DVM & Ultra Video Systems
- *NEW* Optional Water-Resistant, Portable Ticket Printer
- Extended Battery Life with Auto Sleep Mode
- Waterproof & Impact Resistant
- In-The-Field Software Upgradeable
- And More...

*"Overall the Laser Ally is among the best units that I have used beating out the ProLaser III, LTI 20/20 TruSpeed, and Marksman 20/20 units..."* Read the rest of the review.



**Optional Portable Ticket Printer**
A water-resistant, thermal printer that interfaces with the Laser Ally to input speed, distance, etc. onto customizable tickets.

CONTACT US TO PURCHASE, GET A QUOTE OR DEMO

RECEIVE UPDATES & SPECIAL OFFERS ON THIS PRODUCT

DETAILS | COMPARE MODELS | BROCHURES | FUNDING

DESIGNED TO BE TOUGH | PLAY THE FEATURES VIDEO

## LIDAR IMAGE & VIDEO CAPTURE MODELS



**TOP VIEW (FOLDED)**

**Optional 8x Monocular HUD Scope**
For long-range identification. Easily folds to the side of the LIDAR HUD for normal operation.





**Laser Ally LIDARCam**
With protective housing and removable 10MP camera for recording HUD images or video

**Laser Ally DragonCam**
Record secure images or video with LIDAR metadata; controlled by a rugged tablet interface



**Now Available!**
**Laser Ally Compact**

Contact                                                                    Page 1 of 1



# DragonEye Technology

*Advanced Electro-Optical Sensor Systems*

HOME    PRODUCTS    ACCESSORIES    PURCHASE    SUPPORT    ABOUT US    CONTACT

## Contact

For additional information or support please submit the form below or contact us by telephone or email.

DragonEye Technology, LLC      Tel:  770-441-7712 x156
5680 Oakbrook Parkway          Fax:  770-441-7713
Suite 149                      email:  info@dragoneyetech.com
Norcross, GA  30093

### Request Quotation / Additional  Information

Name
　　　　　First　　　Last

Phono

E-mali

Company/Department

Address 1

Address 2

City

State　　[Select State ▽]

Zip

Country　[United States ▽]

**Product Interest**
☐ DragonEye Speed Lidar
☐ DragonEye COMPACT Speed Lidar
☐ DragonEye PRO Lidar
☐ DragonCam
☐ Laser Ally Speed Lidar

**Requests / Comments / Inquiries**

Submit

DragonEye Home | Products | Accessories | Purchase | Support | About Us | Contact

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*



**Speed LIDAR**
A smaller, lighter,
economical model.



Call
Now

**Call 1.800.440.4947**
sales@digitalallyinc.com

Digital Ally © 2004-2013 Copyright. All Rights Reserved. Product & Software Specifications Subject to Change.

**DVM-250 VEDR Video Event Data Recorder | Police Cameras:** DVM-750 In-Car Video System, DVM-500Plus In-Car Law Enforcement Camera, DVM-100
Police In-Car Camera, DV-500Ultra Boat & Motorcycle Video Camera, Compare Law Enforcement Digital In-Car Video Systems, FirstVu Officer-Worn or Mounted
Personal Body Camera, FirstVu HD Body Cams, Digital Video Flashlight Camera | **Police Video System Management | LIDAR Speed Guns | Accessories**
**State Contracts | Testimonials | Digital Ally | Investor Relations | Links & Resources | Code of Ethics & Conduct | Contact Digital Ally | Customer Support**

*Clerk of the District Court, Johnson County Kansas*
*06/05/13  04:41pm SS*



IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL COURT DEPARTMENT

DIGITAL ALLY INC

          Plaintiff

      vs

DRAGONEYE TECHNOLOGY LLC
          Defendant

Case No: 13CV04121
Division:  4
K.S.A. Chapter 60

### SUMMONS

To the above-named defendant:

YOU ARE HEREBY NOTIFIED that an action has been commenced against you in this court. You are required to file your answer to the petition with the court and to serve a copy upon the plaintiff's attorney, as follows:

> Name:   ADAM J GASPER
> Address: 605 WEST 47TH STREET, STE 350
>           KANSAS CITY, MO 64112
> Phone:  (816) 753-5400

Within 30 days after service of summons upon you.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the attached petition, which is incorporated herein by reference. Any related claim which you may have against the plaintiff must be stated as a counterclaim in your answer, or you will thereafter be barred from making such claim in any other action.



Sandy Mc Curdy

Clerk of the District Court

Dated:  June 06, 2013

Johnson County Court House, 100 N. Kansas Ave.  Olathe,  KS 66061

*Clerk of the District Court, Johnson County Kansas*
*6/6/2013 08:31:45 SS*

IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL COURT DEPARTMENT

DIGITAL ALLY INC

Plaintiff

vs

Case No: 13CV04121
Division:   4
K.S.A. Chapter 60

DRAGONEYE TECHNOLOGY LLC
Defendant

## REQUEST AND SERVICE INSTRUCTION FORM

To: Clerk of the District Court:

Please issue a SUMMONS and PETITION in this action for DRAGONEYE TECHNOLOGY LLC
whose address for service is:

5680 OAKBROOK PARKWAY, SUITE 149
NORCROSS, GA 30093

Service by an authorized process server.

By: /s/ ADAM J GASPER
ADAM J GASPER, #23967
605 WEST 47TH STREET, STE 350
KANSAS CITY, MO 64112
816-753-5400

*Clerk of the District Court. Johnson County Kansas*
*06/05/13  04:41pm SS*