**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

DIGITAL ALLY, INC., a Nevada )
Corporation, )
)
)
           **Plaintiff,** )
)
v. )
)    Case No. 13-2290-CM
)
DRAGONEYE TECHNOLOGY, LLC, a )
Georgia Limited Liability Company, )
)
           **Defendant.** )
)

## MEMORANDUM AND ORDER

Plaintiff Digital Ally, Inc. ("Digital") filed this suit against Defendant DragonEye Technology, LLC ("DragonEye") in the District Court of Johnson County, Kansas. In its Petition, Digital alleges (1) breach of contract; (2) declaratory judgment to terminate the contract; (3) tortious interference with contract and business expectancies; (4) trademark infringement under § 32 and § 43(a) of the Lanham Act; (5) violation of the Kansas Uniform Trade Secrets Act ("UTSA"); and (6) conversion. The case arises out of written agreements between the parties. Under the agreements, DragonEye agreed to manufacture and sell to Digital handheld law enforcement laser speed measurement devices. Digital then sold the devices under the brand name "Laser Ally." DragonEye removed the state court action to this court and filed counterclaims for non-payment of amounts due.

The case is before the court on the Verified Motion of Plaintiff Digital Ally, Inc. for Restraining Order and for Temporary Injunction (Doc. 7-2). Digital asks the court for the following relief:

- "[E]njoin DragonEye from using, displaying and selling goods depicting Digital's registered trademarks and/or Digital's 'unregistered' but nonetheless protectable trade dress" (Doc. 7-3 at 2.);
- Prohibit DragonEye from using any alleged "Confidential Information" or any information that constitutes protectable "trade secrets" within the meaning of the UTSA (*Id.*); and
- Order DragonEye to return to Digital all of its files, records, and the like that either (1) bear the trade name and marks of "Digital Ally" and "Laser Ally"; and/or (2) contain any alleged "Confidential Information," "Intellectual Property," or Trade Secret" belonging to Digital (*See* Doc. 7-2 at 16.).

The court conducted an evidentiary hearing. Having considering the evidence presented at the hearing, the arguments in the parties' briefs, and the law governing the case, the court is now prepared to issues its Findings of Fact and Conclusions of Law. For the following reasons, the court denies Digital's motion.

## **FINDINGS OF FACTS**

The court makes the following findings of facts:

**A. The Parties and Their Officers**

1. DragonEye is a limited liability company located in Norcross, Georgia.
2. DragonEye manufactures and sells Lidar handheld law enforcement laser speed measurement devices. These devices measure vehicular speed for law enforcement purposes.
3. Digital manufactures and sells law enforcement products.
4. Thomas J. Heckman is Digital's Chief Financial Officer.
5. At all relevant times, Ken McCoy was Digital's Vice President of Marketing.
6. Scott Patterson is DragonEye's president.

**B. May 1, 2010 Supply Agreement**

7. On or about May 1, 2010, Digital and DragonEye executed a Supply Agreement. Under the agreement, the parties agreed that:

    a. DragonEye would manufacture and Digital would distribute and sell DragonEye's handheld law enforcement laser speed measurement device, as that product is specified and described in Schedule A to the Supply Agreement ("Lidar Units"), under the brand name "Laser Ally";

    b. Digital would be the exclusive worldwide distributor of the Lidar Units to law enforcement end users;

    c. At a minimum, Digital would purchase 1,000 Lidar Units from DragonEye during the first eighteen months of the Supply Agreement, and 1,000 Units per year after that;

    d. Digital would pay DragonEye for all Lidar Units, net thirty days from the date of receipt of the product, based on the parties' agreed pricing schedule (i.e., $1763.00 per unit);

    e. The term of the agreement would be for 3.5 years;

    f. DragonEye would retain all trade dress, intellectual property, and proprietary rights to the design and specifications for the Lidar Units.

**C. January 31, 2012 Amendment to the Supply Agreement**

8. In December 2011, Digital advised DragonEye that Digital was unable to sell the minimum number of Lidar Units per year. Digital asked for a reduction in purchase commitment to forty units per month instead of eighty-four.

9. At the time, DragonEye had seven employees, and Digital represented ninety percent of its business. Reducing Digital's mandatory purchase requirements by half would essentially cut DragonEye's business and revenues in half.

10. In order to fill that void, DragonEye insisted that Digital's exclusive right to sell the Lidar Units be eliminated so DragonEye could sell the product directly to dealers, distributors, and end-users/third parties. Mr. McCoy (on behalf of Digital) agreed.

11. On or about January 31, 2012, DragonEye and Digital executed the Amendment to the Supply Agreement ("Amendment"), in which DragonEye and Digital agreed:

    a. Digital's rights to act as the exclusive worldwide distributor of DragonEye's Lidar Unit marketed by Digital under the name "Laser Ally" would be eliminated;

    b. Digital would have the "nonexclusive" right to sell and distribute the Laser Ally, LIDARcam, Printer Combo, DragonCam, and DragonEye's Compact Lidar to law enforcement end users, but not including "the right to sell the Product or modifications thereof to users outside of law enforcement" (Doc. 10-4 at 20.);

    c. DragonEye could "from time to time, at its sole discretion, . . . sell the Product to other distributors or dealers or otherwise directly or indirectly sell the Product to third parties" (*Id.*); and

    d. Digital only had to purchase forty Laser Ally units per month instead of eighty-four.

12. The parties intended that DragonEye could freely compete with Digital in the marketplace and sell all Lidar handheld law enforcement speed measurement devices to other dealers, distributors, and third parties—regardless whether the names of those entities may appear on Exhibit 22, Digital's Warranty List, or any future warranty list.

13. Following execution of the Amendment, DragonEye began to manufacture and market its version of the Laser Ally, naming it the "DragonEye Speed Lidar."

14. Digital is over thirty days past due on invoices from DragonEye, totaling $190,000 or more.

15. Digital has not paid the balance because of DragonEye's alleged trademark infringement.

### D. Digital's Trademark Infringement Claim

16. Digital is the owner and holder of the trademark "Laser Ally."

17. Each Laser Ally speed gun unit manufactured by DragonEye and sold to Digital bears the name "DragonEye Technology, LLC" at the bottom of the unit's handle.

18. DragonEye maintains an internet website at www.dragoneyetech.com.

19. Digital maintains a separate internet website at www.digitalallyinc.com.

20. Beginning in or about 2011, DragonEye posted a link on its internet website that allowed a user to click the Digital Ally/Laser Ally icon to be taken directly to Digital's internet website.

21. At all relevant times, Digital was aware of DragonEye's website.

22. DragonEye placed the direct link on its website to assist Digital in the marketing and promotion of its Laser Ally-branded Lidar Units. In a September 13, 2011 email to Mr. McCoy, Mr. Patterson wrote, "[w]e have updated our website to show these products and also redirect inquiries on the Laser Ally to your website (let me know if you want anything added or changed). www.dragoneyetech.com." Mr. McCoy responded, "Thanks and no problem on keeping the name the same." (Ex. 109.) This exchange, while less than clear, suggests that Digital knew about the link and use of its trademark as early as September 2011.

23. DragonEye, with Mr. McCoy's knowledge, also formerly posted a video promoting Digital's Laser Ally product on its DragonEye YouTube Channel.

24. DragonEye's website promotion of the Laser Ally stated that the Laser Ally is "distributed exclusively by Digital Ally, Inc." DragonEye's website has never indicated that DragonEye would or could sell the Laser Ally product directly.

25. Before filing this action on June 5, 2013, Digital never complained, protested, or otherwise gave notice to DragonEye that it objected to the direct link to Digital's website. Digital also did not request that the link be removed or modified.

26. Once served with summons in June 2013, DragonEye promptly removed the link to the Digital Ally website and has since removed all former references to Digital and/or Laser Ally.

27. The consumer base for the Lidar speed gun product is limited, consisting primarily of law enforcement agencies and dealers and distributors of law enforcement products.

28. Moreover, the Digital Laser Ally and DragonEye Speed Lidar are two names for products, both manufactured by DragonEye, with identical features and performance. The International Association of Chiefs of Police ("IACP") has publicly stated this fact since July 2010. The DragonEye Speed Lidar and Laser Ally were, and continue to be, identified publically as identical in shape, size, and all performance features. Only the trade name and labeling differ.

29. DragonEye has never sold any Lidar Units bearing the brand name Laser Ally to any person, firm, or public agency (other than Digital).

30. DragonEye's records document only two inquiries (one phone call and one email inquiry—but no website inquiry) from prospective customers related to the Laser Ally-branded product. DragonEye promptly passed both inquiries on to Brian Hill at Digital.

**E. Digital's "Confidential Information and/or Intellectual Property"**

31. Digital alleges that DragonEye misappropriated Digital's "Confidential Information and/or Intellectual Property," to sell Lidar products to the following entities:

    a. Davtech Analytical Services (Canada) Inc. ("Davtech");

    b. G. Hawgood & Associates ("Hawgood");

    c. Tactical Solutions ("Tactical");

    d. Integrated Technology Systems ("ITS");

    e. Gwinnett County, Georgia ("Gwinnett County"); and

    f. Montgomery County, Maryland ("Montgomery County").

32. Section 1.3 of the Supply Agreement states, among other things, that the term "Confidential Information" means any information written or verbal that is either

> (a) disclosed in written or tangible form and plainly marked "confidential," "proprietary," or the like, or (b) disclosed in another manner, with written notice of the confidential or proprietary nature of such information being provided by the Disclosing Party to the Recipient within 15 days of the original disclosure to or observance by the Recipient. Confidential Information does not include, and this Section does not apply to, any information that (z) is or becomes generally available to the public . . . , [or] (y) was available to Recipient on a non-confidential basis prior to its disclosure. . . .

33. Exhibit 22 is a warranty list of Digital's customers, which was provided to DragonEye per § 8.5 of the Supply Agreement. Digital presented no evidence that it has ever given DragonEye a list of Digital's dealers, distributors, or customers that was marked "confidential."

34. The market for handheld Lidar speed gun products is limited essentially to public law enforcement agencies. By law, nearly all bids are public and openly competitive.

35. At various times, DragonEye has conducted "Google" internet searches to learn who is distributing/selling Lidar-based products—including Digital Ally's Laser Ally units.

**(i) Davtech**

36. Davtech is a seller/distributor of law enforcement products in Canada. For the past thirteen years, Davtech has marketed its products on its internet website.

37. Davtech is not a "law enforcement end user" within the meaning of § 2 of the Supply Agreement as amended.

38. Davtech is neither a dealer nor a distributor for DragonEye.

39. Davtech has not purchased any Laser Ally-branded Lidar Units from DragonEye.

40. Davtech has not purchased the DragonEye Speed Lidar from DragonEye, but did purchase two units through Decatur Electronics (without the knowledge of DragonEye).

41. Davtech has not purchased any spare parts from DragonEye that are imprinted or labeled with the Digital Ally or Laser Ally markings. But, in the past, Davtech has purchased spare parts from DragonEye with the knowledge of Digital.

42. Digital has not presented any credible evidence that it lost any sales to Davtech (and/or the Ontario Provincial Police) as a result of any alleged impropriety and/or alleged use of Digital's confidential information.

### (ii) Hawgood

43. Hawgood is a seller/distributor of law enforcement products in Australia.

44. Hawgood is not a "law enforcement end user" within the meaning of § 2 of the Supply Agreement as amended.

45. Hawgood markets its products on its internet website at www.ghawgood.com.

46. Before learning or hearing about Hawgood from Digital, Mr. Patterson was aware of Hawgood and the fact that it was a dealer for Decatur Electronics. Patterson learned of Hawgood through an Australian dealer named Ballinger, who he has known for about fifteen years.

47. Hawgood has not purchased any Laser Ally Lidar units from DragonEye.

48. Hawgood has not purchased the DragonEye Speed Lidar from DragonEye. DragonEye has sold one DragonCam and three DragonEye Compact Lidar Lasers to Hawgood. But these items are not "Product" as defined by § 1.1 and listed in Schedule A to the Supply Agreement.

### (iii) Tactical and ITS

49. Digital's 2012 FORM 10-Q SEC year-end quarterly report (available on its website) confirms Digital's strategy to eliminate independent representation in favor of direct sales employees:

> We reorganized our domestic sales force and organization for our law
> enforcement channel during 2012. Traditionally, we have used third party sales
> agents to market our law enforcement products domestically. We have changed
> principally to an employee based direct sales force that provides us with more
> control and monitoring of our sales force and their daily activities. . . . We
> believe that a portion of the revenue decrease experienced in 2011 and early
> 2012 revenues resulted from third party sales agents reducing their sales efforts
> because they did not have the financial resources to travel, meet and market
> directly to their customers as a result of the difficult economic conditions. We
> reorganized to address these concerns . . . .

(Hearing Tr. at 71–72; Ex. 107.)

50. Both Tactical and ITS are distributors of law enforcement security products.

51. On July 1, 2012, ITS advised Digital in writing it was terminating their distributor relationship.

52. On October 3, 2012, Tactical emailed Digital, advising it was terminating its distributor relationship with Digital.

53. DragonEye did not entice or encourage either party to end its relationship with Digital.

54. Neither ITS nor Tactical is a "law enforcement end user."

55. DragonEye has sold seven Lidar speed guns to ITS and less than five to Tactical since the companies terminated their distributor relationships with Digital.

### (iv) Gwinnett County

56. DragonEye's office and manufacturing facility is located in Gwinnett County, Georgia.

57. Mr. Patterson worked with Gwinnett County police department as far back as 2004, through his previous position at LaserCraft, Inc.

58. Around March/April 2013 as part of a public bid process, Gwinnett County published a request for quotation ("RFQ"), seeking to purchase twenty-six Lidar-based speed guns.

59. Around March 2013, Sergeant Medved of Gwinnett County telephoned DragonEye, asking if it wanted to respond to the Gwinnett County RFQ. DragonEye submitted a quotation for the equivalent DragonEye Speed Lidar, won the bid, and filled the order. Digital also bid.

60. The Supply Agreement as amended does not prohibit DragonEye from bidding on public contracts and requests for quotations on Lidar-based speed guns.

61. DragonEye did not use any of Digital's alleged confidential information for its 2013 Gwinnett County bid. DragonEye's bid pricing was based on competitors' pricing information for similar products, which can be found on the internet.

62. The Gwinnett County contract/RFQ was the only instance in which DragonEye and Digital bid on the same public contract/RFQ.

63. Lidar product pricing information (Digital's and other competitor's) is generally available and easy to discover, as many government sales require public disclosure of bids and awards. Digital's pricing of its Laser Ally-branded product can be found on its own website, in magazine advertisements, in Washington State Cooperative Alliance ("WSCA") publications, and in Digital's SEC reports—all public information. This information was available prior to the Gwinnett County bid and was the principal basis for the DragonEye Speed Lidar pricing.

**(v) Montgomery County**

64. Mr. Patterson was aware of the Montgomery County police department since at least 2005–2006. Patterson has known the captain of the department for over seven years.

65. Mr. Patterson provided Mr. McCoy with the original contact information for Montgomery County (including Captain Didone and other officers) in December 2010.

66. Prior to February/March of 2013, Digital had only sold two or three Lidar speed gun units to Montgomery County.

67. In February/March 2013, Montgomery County issued an RFQ for Lidar speed gun devices.

68. DragonEye did not bid on Montgomery County's RFQ, but Decatur Electronics did.

69. Decatur Electronics notified DragonEye that it won the bid. DragonEye supplied the product.

**F. Damages**

70. Digital has not presented evidence about the damages it would suffer if the court declines to enjoin DragonEye's conduct.

71. Conversely, DragonEye presented credible evidence that it would go out of business if the court barred the company from transacting business with any post, current, or future customer of Digital, listed on any Warranty Report, such as Exhibit 22.

## CONCLUSIONS OF LAW

The court issues the following conclusions of law:

**A. Standards for a Preliminary Injunction**

1. "To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007); *Am. Civil Liberties Union of Kan. & W. Mo. v. Praeger*, 815 F. Supp. 2d 1204, 1208 (D. Kan. 2011).

2. Injunctive relief is an "extraordinary remedy." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). With that in mind, the court requires parties to clearly establish its necessity. *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989). The right to relief must be "clear and unequivocal." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

3. Three types of injunctions are disfavored in the Tenth Circuit and are subjected to a heightened burden. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). These include preliminary injunctions that (1) disturb the status quo; (2) are

mandatory—not prohibitory; or (3) afford the movant substantially all the relief recoverable after a trial on the merits." *Id.* Courts more closely scrutinize requested relief within these categories. *Id.* And when seeking a disfavored injunction, movants are unable to rely on the Tenth Circuit's modified likelihood-of-success-on-the-merits standard. *Id.* "Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ." *Id.* at 976.

## B. Digital's Claims for Relief

4. Digital claims that DragonEye:

    a. unlawfully infringed on its trade name or mark of "Digital Ally" and "Laser Ally"; and

    b. misappropriated Digital's "Confidential Information and/or Intellectual Property" to sell DragonEye's competing Lidar products, as well as Digital's own Laser Ally-branded products, to Digital's dealers, distributors, and/or customers.

5. Digital asks the court to prohibit DragonEye from:

    a. displaying, publishing, broadcasting, or using Digital's trademarks, trade names, and trade dress; and

    b. copying, duplicating, employing, or using any information disclosed by Digital to DragonEye from May 1, 2010 to the present that was designated as "Confidential Information" in accordance with § 1.3 of the Supply Agreement, which constitutes a Digital "trade secret," and/or "all formulas, patterns, compilations, programs, devices, methods, techniques or processes which Digital derives independent economic value . . . ." (Doc. 7-2 at 15.)

6. Digital further asks the court to enter a mandatory injunction commanding DragonEye immediately to return and surrender to Digital:

    a. "[E]ach and every product, good device, solicitation, advertisement, image, depiction, facsimile or any other thing or material which shows, depicts, uses or employs Digital's trademarks or its trade dress or which contains, embodies or reflects any of Digital's Confidential Information and/or Intellectual Property."

    b. "[E]ach and every flowchart, list, compilation, quotation, proposal, bid, notation, record, diary, memorandum, worksheet, document, thing disclosed to or observed by DragonEye by or respecting DragonEye during the time period May 1, 2010 through the date of such order including, without limitation, every file, code and document which constitutes, contains or duplicates any of Digital's Trade Secrets, Confidential Information or Intellectual Property." (Doc. 7-2 at 16.)

7. Federal Rule of Civil Procedure 65 requires that an injunction be specific in terms, and "describe in reasonable detail . . . the . . . acts restrained or required." Digital's proposed injunctive relief is overly broad and vague. The court is therefore justified in denying injunctive relief on that ground alone. The court will, however, analyze the claims in full.

## C. Likelihood of Success on the Merits

### (i) Trademark Infringement Claims

8. The first factor under *General Motors Corp.* is the likelihood or probability of success on the merits. To establish trademark infringement, a plaintiff must show: "(1) the mark is valid and protectable; (2) defendant used the mark in commerce without consent; and (3) defendant's use of the mark is likely to cause confusion. *Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*, 713 F. Supp. 2d 1267, 1281 (D. Kan. 2010) (citing *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008); *Universal Money Ctrs., Inc. v. AT&T Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994)). Courts consider the following non-

exhaustive factors in evaluating the likelihood of confusion: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Sally Beauty Co. v. BeautyCo, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002). Likelihood of confusion is a question of fact. *Id.*

9. Here, Digital has failed to make the requisite showing that it will prevail on the merits of its trademark infringement claims. Specifically, 15 U.S.C. §1114(1)(a)(b) prohibits the use of trade names or marks, without the consent of the registrant, which is "likely to cause confusion, or to cause mistake, or to deceive . . . ." The DragonEye website's former internet link to Digital's website was not likely to cause confusion, to cause mistake, or to deceive distributors or consumers of handheld Lidar Units.

10. There are several reasons for the lack of confusion. First, the consumer base for handheld Lidar speed gun units is limited in number, consisting primarily of law enforcement agency end users who purchase the product through public bid. Second, the Laser Ally and DragonEye Speed Lidar are two names for products, both manufactured by DragonEye, with identical features and performance. The IACP has publicly stated this fact since July 2010. Third, each Laser Ally speed gun manufactured by DragonEye and sold to Digital bears the name "DragonEye Technology, LLC" at the bottom of the unit's handle. The consumers and/or dealers/distributors who purchase the Lidar product are sophisticated buyers, well familiar with who the "players" are (i.e., the manufacturers, dealers and regional distributors), and the fact that DragonEye is the manufacturer of Digital's Laser Ally-branded product.

11. Also, DragonEye's former website link stated that the Laser Ally, manufactured by DragonEye, is, "distributed exclusively by Digital Ally, Inc." The website did not indicate that DragonEye would or could sell the Laser Ally-branded product directly. And DragonEye has never received any website inquiries about purchasing the Laser Ally-branded product.

12. Digital's probability of success on its infringement claims is further doubtful at this time, given that DragonEye presented evidence that it created the direct link with the express knowledge, consent, and acquiescence of Digital. Although the September 13, 2011 email exchange was less than clear, at a minimum, it indicates that Digital was aware of the link on the website. "Laches," "estoppel," and "acquiescence" are affirmative defenses to an action for trademark infringement.[1] 15 U.S.C. § 1115(b)(9).

13. Finally, Digital's trademark infringement claims as to trade dress run contrary to the express terms of the § 10.1 of the Supply Agreement. Under that provision, DragonEye retained all ownership and proprietary rights to the trade dress, design, specifications and functionality of the Lidar Units, including those marketed and sold under the name "Laser Ally." Per the terms of the Amendment, § 2, DragonEye, among other things, contractually has the right to sell a product with the same trade dress (i.e., the design and appearance of a product, size, shape, color, texture, and graphics) as the Laser Ally unit.

**(ii) Claims for Misappropriation of "Confidential Information"**

14. Digital alleges that its Warranty List (Exhibit 22), provided to DragonEye pursuant to § 8.5 of the Supply Agreement, constitutes "Confidential Information." But even assuming this is correct, Digital failed to provide any evidence that: (1) DragonEye improperly used the information contained in the Warranty List; (2) the customer information in the list was not otherwise generally available to the public or already known to DragonEye; or (3) Digital lost a

---

[1] The court makes no finding on the ultimate success of these defenses.

-15-

sale or was otherwise damaged as a result. For these reasons, Digital has not met its burden to show a substantial likelihood that it will prevail on the merits of its misappropriation claims.

15. The key problem with Digital's misappropriation argument is that § 2 of the Amendment eliminated Digital's rights to act as the exclusive worldwide distributor of DragonEye's Lidar Speed gun marketed under the Laser Ally brand name—thereby allowing DragonEye to freely compete in the marketplace. Under the Amendment, DragonEye was given the express, unconditional right "from time to time, at its sole discretion, to sell the Product to other distributors or dealers or otherwise directly or indirectly sell the Product to third parties." (Ex. 6 at § 2.)

16. Digital's argument that DragonEye may have used "Confidential Information" to sell its Lidar-based products to Davtech, Hawgood, Tactical, and ITS fails for an additional reason as well. These companies are not "law enforcement end users." Rather, each is only a dealer or distributor of law enforcement products.

17. Pursuant to both § 2 of the Supply Agreement and the Amendment, Digital was contractually restricted to selling the DragonEye-manufactured Lidar product to "law enforcement end-users" only. The Amendment was specific that Digital would have only the "nonexclusive" right to sell and distribute the Laser Ally, LIDARcam, Printer Combo, DragonCam, and DragonEye's Compact Lidar to "law enforcement end users," and that "[t]he foregoing grant of rights to Purchaser does not include the right to sell the Product or modifications thereof to users outside of law enforcement."

18. Digital's claim that DragonEye used some sort of "Confidential Information" or "Trade Secret" to learn of and/or secure sales to Gwinnett County—who is actually a law enforcement end-user—is not supported by evidence. As previously noted, DragonEye's office and

manufacturing facility is located in Gwinnett County.  Mr. Patterson had worked with and supplied Gwinnett County Police with red light camera systems as far back as 2004–05.

19. Similarly, the evidence shows that DragonEye was aware of Montgomery County since 2005–06.  Again, there is no evidence that DragonEye used "Confidential Information" or "Trade Secrets" to secure sales to Montgomery County.

**D. Irreparable Harm**

20. The second *General Motors* factor is irreparable harm to the movant if the injunction is denied. *General Motors*, 500 F.3d at 1226.  "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  Irreparable harm is more than "merely serious or substantial" harm.  *Id.* (citations and internal quotation marks omitted).  A plaintiff must show a significant risk of harm incurable by monetary damages.  *Greater Yellowstone Coal.*, 321 F.3d at 1258.  The proponent of the injunctive relief must show that "the injury complained of is of such imminence that there is a clear and present need for equitable relief . . . ."  *Heideman*, 348 F.3d at 1189.

21. Digital has failed to meet its burden for the second factor.  First, DragonEye promptly removed the direct link to the Digital Ally website once served with summons.  Second, the website did not indicate that DragonEye would or could sell the Laser Ally-branded product directly.  Third, DragonEye has not received any inquiries through its website from a prospective customer seeking to purchase the Laser Ally-branded product.  Although DragonEye has received two other inquiries, DragonEye promptly passed them on to Digital.  And finally, DragonEye has never sold or attempted to sell a Laser Ally-branded product or spare part, except through Digital.

22. Digital's contention that it has or may be irreparably harmed by DragonEye's misappropriation of Digital's "Confidential Information," "Intellectual Property" and/or "Trade Secret" is unfounded, speculative, and theoretical. Conclusory statements—without more—are insufficient to show irreparable harm. *Univ. Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1148 (D. Kan. 2007).

23. Evidence presented at the injunction hearing established that commencing in early 2012, Digital implemented a sales strategy to eliminate independent representation in favor of direct sales employees. Accordingly, any sale or future sale by DragonEye of its Lidar-based products to any U.S.-based distributors such as Tactical or ITS would cause minimal—if any—harm to Digital, because Digital was phasing out its domestic distributors in favor of its in-house sale team.

24. In addition, § 13.2(b) of the Supply Agreement states:

> [the] identity of, and terms under which Purchaser does business with its customers is Purchaser's Confidential Information. Supplier represents and warrants that it will not use Purchaser's Confidential Information to circumvent or attempt to circumvent, avoid, bypass or obviate, any payment of compensation to which Purchaser would be entitled under any verbal or written agreement or other business arrangement with its customers . . . .

25. Digital did not present any credible evidence that it would have secured the sale of Laser Ally-branded Lidar products with respect to any sales or transactions of which it complains. The undisputed evidence at the injunction hearing was that the 2013 Gwinnett County contract and RFQ for twenty-six Lidar based speed guns was the only time DragonEye and Digital have ever placed competing bids on the same public contract/RFQ. In that regard, no evidence was presented that any sales and sales contacts made by DragonEye (or its dealers) interfered in any way with any payment due to Digital from any existing business contract or arrangement established by Digital. Digital provided no evidence that it had any such agreements in place

with customers (Montgomery County or Gwinnett County), or dealers (Hawgood, Davtech, Tactical, or ITS). In fact, Digital did not present any written agreements with which it contends DragonEye interfered or under which DragonEye deprived Digital of payment.

26. Finally, granting the injunctive relief sought by Digital will not remedy any identifiable alleged wrong. Digital has an adequate remedy at law for any proven violations of the Lanham Act (particularly where it is indebted to DragonEye in excess of $190,000). DragonEye no longer references Digital Ally or Laser Ally on its website, and there is no credible proof that DragonEye has ever misappropriated any of Digital's alleged "Confidential Information," "Intellectual Property" and/or "Trade Secrets."

**E. Balance of Harm**

27. The third *General Motors* factor, "balance of harms," also warrants denial. Again, DragonEye promptly removed the Digital Ally link from its website. Where the non-movant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489–90 (8th Cir. 1993) (noting that a consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a *preliminary* injunction." *Id.* at 490.

28. As stated above, Digital's claim that DragonEye is guilty of misappropriation of Digital's "Confidential Information," "Intellectual Property" and/or "Trade Secrets" is speculative and theoretical at best. An illusory harm to the movant will not outweigh any actual harm to the

non-movant.  *See Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1023 (8th Cir. 1992).

29. Conversely, actual harm to DragonEye if injunctive relief is granted is real.  DragonEye presented credible evidence at the injunction hearing that if the court enters a broad preliminary injunction order, barring DragonEye from transacting business with any post, current, or future customer of Digital, and listed on any Warranty Report such as Exhibit 22, it would essentially put DragonEye out of business.  If the broad injunctive relief sought by Digital is granted, it would create a "chilling effect" on DragonEye's ability to sell its Lidar products.

30. The entry of a broad injunction order against DragonEye would create a blanket, timeless, and scopeless non-compete agreement—contrary to express terms and conditions of the Supply Agreement as amended.  Such a scenario is commercially unreasonable and would be both logically and legally inconsistent.  Digital did not bargain for a broad non-compete agreement.

**F. Public Interest**

31. The final factor in the *General Motors* analysis is the impact of granting or denying the preliminary injunction on the public interest.  Public interest would best be served through allowing DragonEye to service any warranty claims.  DragonEye cannot service claims if it must give up its Warranty list.  Public interest would best be served to allow both Digital and DragonEye to freely compete, per the terms of the Amendment.

**IT IS THEREFORE ORDERED** that the Verified Motion of Plaintiff Digital Ally, Inc. for Restraining Order and for Temporary Injunction (Doc. 7-2) is denied.

Dated this 17th day of October, 2013, at Kansas City, Kansas.

                                                        s/ Carlos Murguia
                                                        **CARLOS MURGUIA**
                                                        **United States District Judge**